UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>Linda A. Beck</u>

v.                                  Civil No. 10-cv-362-JL
                                    Opinion No. 2011 DNH 146
<u>Michael J. Astrue, Commissioner,</u>
<u>Social Security Administration</u>

<u>**MEMORANDUM ORDER**</u>

This is an appeal from the denial of a claimant's application for Social Security Disability Benefits.  <u>See</u> 42 U.S.C. § 405(g).  The claimant, Linda Ann Beck, contends that the administrative law judge ("ALJ") incorrectly found that although Beck suffered from "a single episode of cardiomyopathy with congestive heart failure, deep vein thrombosis and pulmonary embolism in January 2008," Admin. R. 9;[1] <u>see</u> 20 C.F.R. §§ 404.1520 (a),(c), she retained the residual functional capacity[2] ("RFC") to perform sedentary work, Admin. R. 10; <u>see</u> 20

---

[1] The court will reference the administrative record ("Admin. R.") to the extent that it recites facts contained in or directly quotes documents from the record.  <u>Cf. Lalime v. Astrue</u>, No. 08-cv-196-PB, 2009 WL 995575, at *1 (D.N.H. Apr. 14, 2009).

[2] "Residual Functional Capacity" is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

C.F.R. § 404.1567(a), and that although she was incapable of performing her past work, Admin. R. 12; see 20 C.F.R. § 404.1520(a)(4)(iv), there were a significant number of employment opportunities available to her.  Admin. R. 12-13; 20 C.F.R. § 404.1520(a)(4)(v).  Beck contends that the ALJ erred in formulating her RFC because she:

> (1) did not grant controlling weight to her treating physician's functional capacity assessment, Admin. R. 11-12; Cl. Br. 4-14; see generally 20 C.F.R. §§ 404.1502, 404.1527(d); SSR 96-2p, 1996 WL 374188 (July 2, 1996), and

> (2) improperly assessed Beck's credibility, rendering her RFC determination flawed.  See Admin. R. 11; Cl. Br. 14-19; see generally SSR 96-7p, 1996 WL 374186 (July 2, 1996).

The Commissioner asserts that the ALJ's findings are supported by substantial evidence in the record, and moves for an order affirming his decision.[3]  This court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 405(g) (Social Security).  After a review of the administrative record, the court concludes that the ALJ's use of Beck's treating physician's RFC assessment was improper, and

---

[3]The Decision Review Board, see generally 20 C.F.R. § 405.401, did not complete its review of the ALJ's denial in a timely fashion, Admin. R. 1, rendering the ALJ's order a final decision of the Commissioner appealable to this court.  See 20 C.F.R. § 405.415.

therefore grants Beck's motion and denies the Commissioner's
motion.

## I.   <u>APPLICABLE LEGAL STANDARD</u>

The court's review under Section 405(g) is "limited to
determining whether the ALJ deployed the proper legal standards
and found facts upon the proper quantum of evidence." <u>Nguyen v.</u>
<u>Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999); <u>see</u> <u>Simmons v. Astrue</u>,
736 F. Supp. 2d 391, 399 (D.N.H. 2010).  If the ALJ's factual
findings are supported by substantial evidence in the record,
they are conclusive, even if the Court does not agree with the
ALJ's decision and other evidence supports a contrary conclusion.
See <u>Tsarelka v. Sec'y of Health & Human Servs.</u>, 842 F.2d 529, 535
(1st Cir. 1988).  Substantial evidence is "such relevant evidence
as a reasonable mind might accept as adequate to support a
conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)
(quotations omitted).  The ALJ is responsible for determining
issues of credibility, resolving conflicting evidence, and
drawing inferences from the evidence in the record.  <u>See</u>
<u>Rodriquez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222
(1st Cir. 1981); <u>Pires v. Astrue</u>, 553 F. Supp. 2d 15, 21 (D.
Mass. 2008) ("resolution of conflicts in the evidence or
questions of credibility is outside the court's purview, and thus

where the record supports more than one outcome, the ALJ's view prevails").  The ALJ's findings are not conclusive, however, if they were "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen, 172 F.3d at 35. If the ALJ made a legal or factual error, the decision may be reversed and remanded to consider new, material evidence, or to apply the correct legal standard.  Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16, 19 (1st Cir. 1996); see 42 U.S.C. § 405(g).

## II.  **BACKGROUND**

Pursuant to this court's local rules, see LR 9.1(d), the parties filed a Joint Statement of Material Facts (document no. 12).  This court will briefly recount the key facts and otherwise incorporates the parties' joint statement by reference.

In January 2008, Beck went to the Parkland Medical Center emergency room in Derry, New Hampshire complaining of a persistent cough and shortness of breath.  Admin. R. 199.  She was treated for pneumonia, id. at 200, but returned a few days later after showing no improvement.  Again, she was told to continue her treatment for pneumonia.  Id. at 209-10.  Finally, on January 15, 2008, Beck was admitted to Parkland, where she was

4

diagnosed with congestive heart failure,[4] pneumonia, pulmonary embolism,[5] deep vein thrombosis,[6] cardiomyopathy,[7] and arterial masses.  Admin. R. 213.  Beck, who was by that time in critical condition, was transferred to Brigham & Women's Hospital in Boston for treatment.  Id. 213-14.  Beck spent approximately 13 days at Brigham & Women's Hospital and then was transferred to a cardiac rehabilitation hospital where she remained an additional 13 days.  Id. at 332-36, 323.  When she entered the rehabilitation facility, Beck was noted to be suffering from severe cardiac and pulmonary conditions and was very weak.  Id. at 271.  Upon discharge on February 13, 2008, facility staff

---

[4]Congestive heart failure is "a clinical syndrome due to heart disease, characterized by breathlessness and abnormal sodium and water retention, often resulting in edema.  The congestion may occur in the lungs or peripheral circulation or both . . . ."  Dorland's Illustrated Medical Dictionary, 686 (31st ed. 2007).

[5]Pulmonary embolism is the "closure of the pulmonary artery or one of its branches by a . . . mass, which may be a blood clot or some other material, that is brought by the bloodstream . . . obstructing circulation."  Id. at 614.

[6]Thrombosis is the presence of a "stationary blood clot along the wall of a blood vessel."  Id. at 1948-49.  Deep vein thrombosis is "thrombosis of one or more deep veins, usually of the lower limb, characterized by swelling, warmth, and erythema; it is frequently a precursor of pulmonary embolism."  Id. at 1948.

[7]Cardiomyopathy is "a general diagnostic term designating primary noninflammatory disease of the heart muscle."  Id. at 299.

noted that Beck "looks good" and that her condition was "[i]mproved but guarded."  Id. at 261-62.

Beck filed an application for Disability Insurance Benefits in March 2008 claiming she became disabled in December 2007 due to myriad cardiac issues and blood clots in her lungs and feet. Id. at 49.  Her application for benefits was denied in May 2008, see id. at 50-53, because it was determined that although Beck's condition was severe, her "condition is not expected to remain severe enough for 12 months in a row to keep [Beck] from working."  Id. at 50.  Beck appealed that decision to the ALJ, id. at 56-58; see generally 20 C.F.R. § 405.301, who, after a hearing in March 2010, Admin. R. 21-48, concluded that Beck was capable of engaging in sedentary work[8] with certain restrictions.[9]  Admin. R. 10; see generally 20 C.F.R. § 1567(a). The ALJ also determined, based on testimony of a vocational

---

[8]Sedentary work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

[9]The ALJ concluded that Beck could not climb ladders, ropes, or scaffolds.  Also, Beck "needs to avoid concentrated exposure to wetness, humidity, noise, vibration and temperature extremes. . . . [Beck] is limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling."  Id. at 10.

expert, Admin. R. 42-47, that Beck was capable of performing a number of jobs available in the national economy, and was not entitled to benefits.  Id. at 13; see generally 20 C.F.R. § 404.1520(a)(4)(v).

The ALJ's RFC analysis necessarily required consideration of medical and testimonial evidence regarding the limiting effects of Beck's cardio-pulmonary problems.  See generally, Manso-Pizarro, 76 F.3d at 17.  Beck testified that although she had been working steadily for over 30 years, Admin. R. 36, she has experienced profound fatigue since her heart failure.  Id. at 30. She also testified that because of the blood clots in her left foot, pain and swelling require her to frequently elevate that foot.  Id. at 39.  She reported in March 2008 that although lifting was too "strenuous on heart" and standing and walking made her feet swell, she was able to do her laundry, dust, shop, drive her car independently, plant flowers, and visit with friends.  Id. at 170-175.

Prior to the hearing, Beck submitted two functional capacity evaluations from her primary cardiologist at Brigham & Women's Hospital, Dr. Benjamin Scirica.  Id. at 412, 540-43, 546-52; see generally 20 C.F.R. § 404.1527.  In his first evaluation dated March 16, 2009, Dr. Scirica opined, inter alia, that because Beck suffered from "Class III-IV heart failure [and] pulmonary

embolism,"[10] she could only sit for a total of four hours each day, stand or walk a total of one hour, and she required a cane to ambulate.  Admin. R. 541.  He stated that she was extremely limited in her ability to complete a "normal full time workday" or workweek and "[p]erform at a consistent pace."  Id. at 412. He also noted that she would need to repeatedly recline at irregular intervals during a regular workday.[11]  Id. at 412.  In December 2009, Dr. Scirica completed another functional capacity evaluation concluding that she continued to have the same marked

---

[10]The New York Heart Association uses a functional classification system to rate different degrees of heart failure. See The Criteria Committee of the New York Heart Association, Diseases of the Heart and Blood Vessels: Nomenclature and Criteria for Diagnosis (6th ed. 1964).  According to the Heart Failure Society of America, "[t]his system relates symptoms to everyday activities and the patient's quality of life."  Heart Failure Society of America, The Stages of Heart Failure - NYHA Classification, *available at* http://www.abouthf.org/ questions_stages.htm.  "Class III" heart failure is defined as "moderate" heart failure.  A patient with Class III heart failure has "[m]arked limitation of physical activity.  Comfortable at rest, but less than ordinary activity causes fatigue, palpitation, or dyspnea."  Id.  A Class IV patient has "severe" symptoms and is "unable to carry out any physical activity without discomfort."  Id.  By contrast, "Class II" or "mild" heart failure patients show a "slight limitation of physical activity.  Comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea."  Id.  Only Class I patients experience "[n]o limitation of physical activity."  Id.

[11]Dr. Scirica opined in March 2009 that Beck could occasionally lift and/or carry up to 10 pounds.  By his December evaluation, he felt she could never carry that amount.  Id. at 540, 546.

8

limitations as a result of "[d]econditioning/weakness from heart failure," pain, and poor balance.  Id. at 546-552.  He further noted that Beck would "rarely" be able to engage in part-time or full-time employment.  Id. at 552.

In contrast, Dr. Charles Meader, an non-examining agency consulting physician, completed a functional review in May 2008 offering his opinion on Beck's *expected* functional abilities by December 2008.  Id. at 398-405.  Dr. Meader forecast that although Beck would have some postural and environmental limitations, id. at 400, 402, she would be able to stand/walk at least two hours per eight hour workday and sit at least 6 hours per workday.  Id. at 399.  He noted that her symptoms related to her medical condition, and that her allegations were credible. He concluded, however, that although she still exhibited severe limitations in May 2008, because she had shown steady improvement during her stay at a cardiac rehabilitation center the prior February, he expected her functional capacity to improve to where

she was capable of full-time work by December 2008.[12]  <u>Id.</u> at
405.

In her order, the ALJ chose to afford only "limited weight"
to Dr. Scirica's two functional capacity evaluations and
"carefully considered" Dr. Meader's opinion.  <u>Id.</u> at 11-12.  The
AlJ concluded that based on Dr. Meader's opinion that Beck "would
be expected to be able to return to work within 12 months of her
onset,  . . . in combination with Dr. Scirica's report that
[Beck] could lift 10 pounds[,]" Beck could perform sedentary work
and was not disabled.  <u>Id.</u> at 12-15.  After the Decision Review
Board failed to review the matter in a timely basis, <u>id.</u> at 1;
<u>see</u> <u>generally</u>, 20 C.F.R. § 405.415, this appeal followed.


## III.  <u>**ANALYSIS**</u>

A five-step process is used to evaluate an application for
social security benefits.  20 C.F.R. § 404.1520(a)(4).  The
applicant bears the burden through the first four steps to show

---

[12]The record contains many treatment notes by Nurse Mary Ann
Johnson, APRN, of Lamprey Health Care.  <u>See</u> <u>id.</u> at 447-501, 513-
38, 562-70.  Although Beck's visits were frequent, the parties
agree that they were primarily to monitor Beck's use of the anti-
coagulant, Coumadin.  Joint Stmt. of Material Facts (document no.
12) at 3.  As discussed <u>infra</u> note 18, Nurse Johnson did not
complete a formal functional evaluation, but did opine that Beck
was incapable of working.  Admin. R. 569.

that she is disabled.[13]  <u>Freeman v. Barnhart</u>, 274 F.3d 606, 608
(1st Cir. 2001).  At the fifth step, the Commissioner bears the
burden of showing that a claimant has the residual functional
capacity to perform other work that may exist in the national
economy.  <u>Id.</u>; <u>see also</u> 20 C.F.R. § 404.1520(a)(4)(v); <u>Heggarty</u>
<u>v. Sullivan</u>, 947 F.2d 990, 995 (1st Cir. 1991).  The ALJ's
conclusions at steps four and five are informed by his assessment
of a claimant's RFC, which is a description of the kind of work
that the claimant is able to perform despite her impairments.  20
C.F.R. §§ 404.1520(a)(4), 404.1545.

## A.   Treating source opinion

Beck asserts that the ALJ failed to properly weigh the
medical opinion of her treating physician, Dr. Scirica.  Cl. Br.
4-14.  In particular, Beck faults the ALJ for granting only

---

[13]Specifically, the claimant must show that:  (1) she is not
engaged in substantial gainful activity; (2) she has a severe
impairment; (3) the impairment meets or equals a specific
impairment listed in the Social Security regulations; or (4) the
impairment prevents or prevented her from performing past
relevant work.  The Social Security Act defines disability as the
"inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than 12 months."  42 U.S.C.A. § 423(d)(1)(A).

"limited weight" to Dr. Scirica's two functional capacity evaluations.

> In her discussion of Beck's RFC, the ALJ stated that

> even as early as June 2008 [Beck's] medical treatment
> records indicate that she was becoming more active and
> even doing some gardening activities. . . . Even as
> early as May 2008 Dr. Scirica noted that [Beck] was
> doing quite well, was increasing her muscle mass.  In
> September 2008 he noted that [Beck] was able to do her
> activities of daily living . . ., although she still
> reported fatigue climbing a flight of stairs.  In April
> 2009 she was able to walk 10-15 minutes with her dogs.

Admin. R. 11 (citations omitted).  The ALJ therefore concluded that "the limitations listed by Dr. Scirica in December 2009 appear to be based primarily on subjective complaints.  They are distinctly inconsistent with Dr. Scirica's own clinical observations and with the claimant's lack of reported symptoms or signs of recurrent cardiac events."  Id.  Instead, the ALJ "carefully considered" the opinion of Dr. Meader, that Beck "would be expected to be able to return to work within 12 months of her onset" and concluded that Beck was capable of engaging in sedentary work.  Id. at 11-12.

Beck contends that not only did Dr. Scirica's records support his functional conclusions, but that the ALJ took Dr. Scirica's observations that Beck was "doing quite well" or "looked well" out of context.  Beck asserts that Dr. Scirica used these terms in the context of her recovery from a very serious

12

cardiac illness, and that Dr. Scirica's notations do not mean that Beck "was capable of engaging in some form of substantial gainful activity." Cl. Br. 8. Beck argues, therefore, that Dr. Scirica's opinion that she could not work is not "wholly inconsistent" with his clinical records and his opinion should have been given more weight.

In a step four analysis, the ALJ, having already determined that the claimant suffers a severe impairment, makes a determination of the claimant's current functional capacity, or RFC. If the RFC finding is supported by substantial evidence in the record, it is conclusive. Nguyen, 172 F.3d at 35. Determination of a claimant's RFC is an administrative decision that is the responsibility of the Commissioner. See 20 C.F.R. § 404.1527(e)(2), SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). An ALJ is prohibited, however, from disregarding relevant medical source opinions. See SSR 96-5p, 1996 WL 374183, at *5. Where an ALJ's RFC assessment is at odds with a medical source opinion, he must explain his reasons for disregarding that opinion. See 20 C.F.R. § 404.1527(d); SSR 96-8p, 1996 WL 374184, at *7; Marshall v. Astrue, No. 08-cv-147-JD, 2008 WL 5396295, at *3 (D.N.H. Dec. 22, 2008).

A "treating physician's opinion is generally afforded controlling weight if it is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." Lopes v. Barnhart, 372 F. Supp. 2d 185, 193-94 (D. Mass. 2005) (quotations and brackets omitted); see generally SSR No. 96-2p, 1996 WL 374188, at *1; Marshall, 2008 WL 5396295, at *3; 20 C.F.R. § 404.1527(d)(2).  "The First Circuit has held . . . that when a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of controlling weight does not apply." Rosario v. Apfel, 85 F. Supp. 2d 62, 67 (D. Mass. 2000) (quotations omitted).

An ALJ, however, cannot simply state that treating physician's functional evaluation is inconsistent with the record, rather, the claimed inconsistencies must be adequately supported by the record as well.  See Dietz v. Astrue, No. 08-30123-KPN, 2009 WL 1532348, at *7 (D. Mass. May 29, 2009).  Thus, the analysis regarding a hearing officer's choice to give less weight to a treating source opinion centers on two issues. "First, whether the hearing officer had a reasonable explanation for rejecting the opinions of the treating physician[] and, second, whether the hearing officer had substantial evidence to support the . . . contrary finding." Monroe v. Barnhart, 471 F. Supp. 2d 203, 211-12 (D. Mass. 2007).  In this instance, the court concludes that the ALJ's decision to grant little weight to

14

Dr. Scirica's functional evaluations was not adequately supported, and therefore her order should be reversed.

**1.   Functional meaning of "doing well"**

Beck first argues that the ALJ erred when she determined that Dr. Scirica's RFC evaluations were "distinctly inconsistent" with "his own clinical observations as [sic] where he noted that the claimant could walk [her] dogs even in April 2009 and that she looked well."[14]   Id.   Beck contends that although there are several notations in Dr. Scirica's treatment notes that Beck was "doing well" or "looked well," Cl. Br. 7, the ALJ's interpretation "is problematic" because "[d]oing well within the context of the [claimant's] medical impairments" does not necessarily mean she was not disabled.   Id. at 8 (quotations omitted).   She asserts that because the ALJ misinterpreted the meaning of "looked well" or "doing well," the ALJ's conclusion that Dr. Scirica's RFC assessment was inconsistent with his treatment notes is flawed and as such the ALJ's decision should be reversed.   The court agrees.

---

[14]In assessing the credibility of Beck's claim that she was fatigued and functionally limited, the ALJ observed that in May 2008, Dr. Scirica "noted that the claimant was doing quite well . . . ."   Admin. R. 11.

"[T]he phrase 'doing well' is relative and should be viewed
in the context of the illness a person suffers from." Brascher
v. Astrue, No. 3:10CV256, 2011 WL 1637029, at *7 (E.D. Va. Mar.
11, 2011).  The fact that a patient is found to be "doing well"
or that a patient's condition is "stable," "does not compel the
conclusion that [a] claimant was capable of engaging in
substantial gainful activity." Barriault v. Astrue, No. 07-cv-
176-SM, 2008 WL 924526, at *7 (D.N.H. Apr. 2, 2008).  Such
superlative terms do "not shed any light on [a claimant's]
residual functional capacity, nor does it provide any information
as to whether [a claimant] was or was not disabled at the time."
Id.  For example, a patient who has had a kidney transplant may
be "doing well" relative to a prior period of kidney failure, but
such observations do "not compel nor support a finding that [a
claimant] was not disabled during the period in question."
Fleshman v. Sullivan, 933 F.2d 674, 676 (8th Cir. 1991); see,
e.g., Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001)
("doing well" in treatment "has no necessary relation to a
clamant's ability to work or to her work-related functional
capacity").  "Therefore, it is not sufficient to focus on the
simple phrase of 'doing well' while disregarding the remainder of
the physician's report." Brascher, 2011 WL 1637029, at *7.
Rather, whether the term "doing well" supports the ALJ's decision

16

that Beck is not disabled is fact specific and must be determined
after a careful review of the context in which the term was used.
Compare Morin v. Astrue, No. 10-cv-159-JL, 2011 WL 2200758, at *8
(June 6, 2011) (clear from the context of the records that the
term "stable" meant that condition of claimant diagnosed with
multiple sclerosis had not deteriorated and she continued to show
high function) with Barriault, 2008 WL 924526, at *7 (fact that
cardiac status was "stable" does not compel finding that claimant
was not disabled; that observation must be viewed in context to
be meaningful).

     A review of Dr. Scirica's records reveals that when taken in
context, it is clear that "doing well" was not indicative of
functional rebirth, but rather referred to the progress of her
recovery relative to Beck's dire medical condition when she first
encountered Dr. Scirica at Brigham & Women's Hospital.  Cf.
Brascher, 2011 WL 1637029, at *7 (error where ALJ failed "to take
into consideration the entirety of the medical record" and focus
only on the "simple phrase" that claimant was "doing well").
Indeed, his positive comments are frequently couched in relative
terms, or are subsequently tempered with observations indicating
that Beck is in ill health.  For example, in February 2008, Dr.
Scirica noted that Beck "actually looks quite well today, much
better than she has in the past."  Admin. R. 373.  He further

stated that Beck "is doing actually fairly well *with a severe cardiomyopathy*." Id. (Emphasis added.)  He continues to observe that Beck "could eventually be a transplant candidate," but is now "in a class III[15] heart failure." Id.

The ALJ specifically cited Dr. Scirica's April 2009 comment that Beck was "doing well" to support her assertion that Dr. Scirica's RFC evaluation was "distinctly inconsistent" with his "own clinical observations" and therefore it was entitled to only limited weight. Id. at 11.  A review of that note indicates that indeed Dr. Scirica was pleased with Beck's recovery and that she showed "symptomatic improvement." Id. at 437.  Dr. Scirica indicates clearly, however, that she is not functionally capable of working on a sustained basis because he recommends that Beck "should enter cardiac rehabilitation" and that "when she finishes rehabilitation she should hopefully be at a state where she can return to work." Id.  Thus Dr. Scirica remains guarded about Beck's prospects for future work and speaks of her recovery in relative terms.  Such notations, when taken in context, are not

---

[15]As set forth supra note 10, a patient with Class III heart failure exhibits marked limitation of physical activity, and is fatigued by even less than ordinary activity.

inconsistent with his March 2009 and December 2009 RFC
assessments.[16]

Other clinical notes follow a similar pattern where Dr.
Scirica appears pleased with her cardiac progress, but his
observations indicate less than full functionality.  In September
2008, he noted that Beck "continues to do well with a class II[17]
heart failure with a severe nonischemic cardiomyopathy. . . . I
have encouraged her to exercise as she can just by starting to
walk and increase her activities."  Id. at 439.  In December
2009, Dr. Scirica indicates that although "[o]ver the last year
and a half she has undergone quite impressive recovery of her
cardiac status. . . . [Beck] still has been significantly
debilitated and weakened from her hospitalization."  Id. at 553.
He observed "[s]ince I last saw her, she did complete cardiac

_____

[16]Contrary to the ALJ's finding, Dr. Scirica's clinical
observation that by April 2009 Beck was able to briefly walk her
dogs for 10-15 minutes per day is also not "distinctly
inconsistent" with his RFC assessments.  The December 2009 RFC
assessment opined that Beck could walk for 10 minutes at a time
for a total of 30 minutes per day and his March 2009 assessment
stated that Beck could walk 30 minutes at a time for a total of
one hour per day.  See Admin. R. 437 (April 2009 office notes);
541 (3/09 RFC), 547 (12/09 RFC).  Each is thus consistent with an
ability to walk a dog 10-15 minutes per day.

[17]As set forth supra note 10, a patient with Class II heart
failure exhibits limitations on physical activity and even
ordinary physical activity "results in fatigue, palpitation, or
dyspnea."

rehab, . . . where she did participate in light activities and did have some mild improvement in her exercise capacity, though even in the end she still demonstrated significant debilitation."

Id.  Finally, he noted, that

> from a cardiovascular standpoint, I think, [Beck] still
> has made quite a remarkable recovery in terms of the
> return of her ventricular function and absence of any
> recurrent thromboembolism. . . . I do think she is
> severely debilitated and deconditioned and will require
> a lot more therapy and activities.  Currently she
> cannot do much, but I have asked her to continue to
> work and try to do as much around the house as she can
> to build up her exertion.

Id. at 554.

In sum, Beck "may be doing as well as can be expected given her case," Gude v. Sullivan, 956 F.2d 791, 794 (8th Cir. 1992), but that fact does not contradict Dr. Scirica's opinion that because Beck continued to struggle with symptoms resulting from her multiple medical issues, she is unable to engage in full-time employment.[18]   Cf. id.  The ALJ's decision to grant Dr. Scirica's

---

[18]Further, "the Commissioner's citations to tidbits from the record to undermine [Dr. Scirica's] opinion are not persuasive." Marshall, 2008 WL 5396295, at *4.  The ALJ noted that "records from ARNP [sic] Johnson indicate that the claimant has consistently denied having symptoms of shortness of breath or fatigue" and thus Dr. Scirica's conclusions were inconsistent with Beck's "lack of reported symptoms or signs of recurrent events." Admin. R. 11.  Although the ALJ is correct that for the most part, there is no listing of additional complaints in Nurse Johnson's records, Beck's brief visits were primarily for routine monitoring of her Coumadin prescription.  Id. at 447-501, 513-38, 562-70.  These visits coincided with Beck's treatment by Dr.

opinion little weight was neither reasonable nor supported by substantial evidence.  The  ALJ's decision is therefore reversed.

## 2.  **Factors used to determine weight**

For purposes of remand, the court notes its concern with the manner in which Dr. Scirica's opinion was considered by the ALJ after she decided not to grant it controlling weight.  <u>See</u> 20 C.F.R. § 404.1527(d).  "When a treating physician's opinion is not given controlling weight, the ALJ is next required to determine the appropriate level of weight that it should be

---

Scirica, her cardiologist, who, as noted above, did express concern about Beck's functionality.  <u>Cf.</u> 20 C.F.R. §§ 404.1513(a)(1)-(5), 404.1527(a)(2) (nurse practitioners are not "medical sources" and therefore do not generate a "medical opinion" that must be considered by an ALJ); <u>Evans v. Barnhart</u>, No. 02-459-M, 2003 WL 22871698, at *5-*6 (D.N.H. Dec. 4, 2003) (regulations establish a hierarchy of evidence with treating sources given the greatest weight and evidence from nurse-practitioners labeled other evidence that "may" be considered by an ALJ).

These records also do not uniformly support the ALJ's conclusion that Dr. Scirica's RFC evaluation is not entitled to controlling weight.  During one visit to Nurse Johnson, (of three specifically referenced by the ALJ), Beck did complain of on-going issues with her left foot "where the blood clots were." Admin. R. 11 (ALJ reference), 532.  Moreover, records from Nurse Johnson included a letter in which she states that Beck "suffered heart failure that has left her with irreparable heart damage. As such, she cannot lift anything, walk far, and tires easily. . . . She has no stamina . . . . I do not feel that she will ever be able to work again . . . ."  <u>Id.</u> at 569.

21

given." Lalime, 2009 WL 995575, at *5.  The regulations counsel

that as

> a treating source, [Dr. Scirica's] opinion regarding
> [Beck's] RFC was entitled to serious consideration here
> based on six enumerated factors:  (i) the length of
> [the] treatment relationship and frequency of
> examination, (ii) the nature and extent of [the]
> treatment relationship, (iii) supportability, _i.e._, the
> adequacy of explanation for his opinions, (iv)
> consistency with the record as a whole, (v) whether
> [he] is offering an opinion on a medical issue related
> to [his] specialty, and (vi) other factors highlighted
> by [Beck] or others.

Dietz, 2009 WL 1532348, at *7; see 20 C.F.R. § 404.1527(d).

These "factors are, no doubt, malleable, but ALJs are required to

always give good reasons explaining the weight given to a

particular physician's opinion." Lalime, 2009 WL 995575, at *5

(quotations omitted).

"Adjudicators must remember that a finding that a treating

source medical opinion . . . is inconsistent with the other

substantial evidence in the case record means only that the

opinion is not entitled to 'controlling weight,' not that the

opinion should be rejected." SSR 96-2p, 1996 WL 374188, at *4.

Based on the ALJ's brief (and flawed) discussion of the weight

given to Dr. Scirica's opinion, it is not clear that in

formulating Beck's RFC, the ALJ considered that:  (i) Dr. Scirica

was the attending physician at Brigham & Women's Hospital when

she was first admitted there, Admin. R. 332, (ii) he continued to

provide follow up care for at least 18 months (possibly two years) on a regular basis after she returned to New Hampshire, <u>id.</u> at 553-54, (iii) his apparent specialty is cardiology as follow-up visits were performed in the "Cardiovascular Clinic," <u>id.</u> at 437, and (iv) his office notes were relatively detailed. <u>See</u>, <u>e.g.</u>, <u>id.</u> at 372-73.  Given the guidance provided by 20 C.F.R. § 404.1527(d), it is difficult to conclude, on this record, that the ALJ's methodology underlying her decision to afford Dr. Scirica's opinion little weight was valid.


**B.   Other issues**

The ALJ's flawed treatment of Dr. Scirica's opinion offers a sufficient basis for remand.  The court need not engage in analysis of Beck's other complaints before the court as they

involve credibility determinations that may vary on remand.[19]

────────────────────

[19]The court however, is troubled by the ALJ's treatment of
Dr. Meader's evaluation as well.  Implicit in Beck's argument
that the ALJ erred in weighing Dr. Scirica's functional
evaluation is the argument that the ALJ also improperly supported
her RFC determination with the evaluation completed by non-
examining, consulting physician, Dr. Meader.

     Although determination of a claimant's RFC is the
responsibility of the ALJ, see 20 C.F.R. § 404.1527(e)(2), an
ALJ, as a lay person, is not equipped to interpret raw medical
data and must rely to some degree on the RFC evaluation of a
physician or some other expert.  See Manso-Pizarro, 76 F.3d at
17.  An ALJ is entitled to credit the opinion of a state agency
consulting physician so "only insofar as they are supported by
evidence in the case record, considering such factors as the
supportability of the opinion in the evidence including any
evidence  . . . that was not before the State agency, [and] the
consistency of the opinion with the record as a whole . . . ."
SSR No. 96-6p, 1996 WL 374180, at *2 (July 2, 1996); see also
DiVirgilio v. Apfel, 21 F. Supp. 2d 76, 81 (D. Mass. 1998)
(weight given to advisory opinions turns in part on whether RFC
is supported by objective medical evidence).  As such, an ALJ
should give less weight to a consulting physician's report if
that physician relied on a partial record.  See, e.g., Rosario,
85 F. Supp. 2d at 68.

     The ALJ's explanation of her reasons for determining Beck's
RFC is thin.  The ALJ stated only that she "carefully considered"
Dr. Meader's opinion that Beck would be able to return to work in
December 2008.  She concluded that Beck was capable of working a
sedentary job for a full eight hour day based on this
"consideration" and Dr. Scirica's notation that she could lift
ten pounds.  Admin. R. 11-12.  Moreover, Dr. Meader's opinion was
rendered a few months after Beck was released from her
hospitalizations, and included Dr. Meader's own observation that
she still had severe limitations.  Id. at 405.  At that time, Dr.
Meader did not have access to Beck's subsequent medical files
spanning many months.  Thus Dr. Meader merely extrapolated future
functionality based on her early, and at that time nascent,
recovery.  In light of the ALJ's almost complete dismissal of
Beck's treating cardiologist, and the ALJ's weak support for her
RFC, the court questions whether the ALJ's RFC rested on

Cf. Lord v. Apfel, 114 F. Supp. 2d 3, 16 (D.N.H. 2000).


**IV.   CONCLUSION**

     Pursuant to sentence four of 42 U.S.C. § 405(g), Beck's

motion to reverse and remand the Commissioner's decision[20] is

granted.   The Commissioner's motion to affirm the decision[21] is

denied.   The Clerk of Court is directed to enter judgment in

accordance with this order and close the case.


          **SO ORDERED.**

                              _____
                              Joseph N. Laplante
                              United States District Judge

Dated:   September 23, 2011

cc:  Raymond J. Kelley, Esq.
     Gretchen Leah Witt, Esq.


---

substantial evidence.   Cf. Rosario, 85 F. Supp. 2d at 68 (ALJ's
decision "relied too heavily on conflicting and incomplete
nontreating physician's reports" and thus "did not rest on
substantial evidence and should be reversed").

     [20]Document no. 10.

     [21]Document no. 11.

25